Teddy M. Kapur (CA Bar No. 242486)
Jeffrey P. Nolan (CA Bar No. 158923)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: 310/277-6910
Facsimile: 310/201-0760
E-mail:    tkapur@pszjlaw.com
              jnolan@pszjlaw.com

Attorneys for Richard M. Pachulski,
Plan Administrator for Bankruptcy
Estate of Randall William Blanchard

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>RANDALL WILLIAM BLANCHARD,<br><br>                    Debtor. | Case No.: 8:14-bk-14105-SC<br><br>Chapter 11 |
| RICHARD M. PACHULSKI, PLAN ADMINISTRATOR FOR BANKRUPTCY ESTATE OF RANDALL W. BLANCHARD,<br><br>                    Plaintiff,<br><br>v.<br><br>RANDALL W. BLANCHARD,<br><br>                    Defendant. | Adv. Proc. No. _____<br><br>**COMPLAINT FOR BREACH OF CONTRACT AND ENFORCEMENT OF DEBT OBLIGATIONS** |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Richard M. Pachulski, as the Plan Administrator (the "Plan Administrator" or "Plaintiff") for the bankruptcy estate (the "Estate") of Randall William Blanchard ("Blanchard"), appointed pursuant to that certain *Fifth Amended Plan of Reorganization Proposed by Chapter 11 Trustee for Randall William Blanchard* [Docket No. 598] (the "Plan"),[1] and the plaintiff in the above-

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to said term in the Plan.

4869-8040-8993.5 68704.003

captioned adversary proceeding (the "<u>Adversary Proceeding</u>"), by his undersigned counsel, as and for his complaint (the "<u>Complaint</u>") against defendant Randall W. Blanchard ("<u>Blanchard</u>" or "<u>Defendant</u>"), alleges upon knowledge of his own actions and upon information and belief as to other matters as follows:

## I.

## PRELIMINARY STATEMENT

1.      The Plan Administrator brings this action against Blanchard to collect upon two unpaid loans totaling more than $354,000 (as discussed further below, the "<u>Debt Obligations</u>") due and payable by Blanchard to the Plan Administrator and the Estate in connection with the Plan. Despite demands for payment made by the Plan Administrator, Blanchard has failed to pay amounts due and owing under the Debt Obligations and the accrued, unpaid interest and other fees and costs thereon.

2.      The Plan Administrator has attempted to resolve this matter efficiently and cost-effectively including through negotiations with Blanchard. Blanchard has been given ample time and opportunity to address and resolve the Debt Obligations, including reasonable time for Blanchard to raise funds.

3.      By the Adversary Proceeding, as remedies, the Plan Administrator seeks (a) damages from Blanchard in an aggregate amount equal to (i) the aggregate outstanding principal due under the Debt Obligations, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Plan Administrator's costs of collection (including all court costs and reasonable attorneys' fees and expenses) and (b) turnover by Blanchard to the Plan Administrator of the foregoing amounts.

## II.

## JURISDICTION AND VENUE

4.      This Adversary Proceeding arises under and relates to Blanchard's Chapter 11 bankruptcy case (the "<u>Case</u>") pending before the United States Bankruptcy Court for the Central District of California (the "<u>Court</u>").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

5.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

6.      This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and, pursuant to Rule 7008 of the Bankruptcy Rules, the Plan Administrator consents to the entry of a final order by the Court in the event that it is later determined that the Court, absent consent of the parties cannot enter final orders or judgments consistent with Article III of the United States Constitution.

7.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

### III.

### THE PARTIES

8.      Plaintiff is the Court-approved Plan Administrator in the Debtor's Case, appointed pursuant to the confirmed Plan.  Pursuant to the Plan (at VII.D), the Plan Administrator is the sole representative of the Estate on and after the Effective Date for purposes of administering the Plan and representing the Estate in all proceedings (including, without limitation, all proceedings before the Bankruptcy Court) on and after the Effective Date.

9.      Plaintiff is informed and believes, and based thereon alleges, that Defendant, the Debtor in the Case, is an individual residing in Irvine, California.

### IV.

### STATEMENT OF FACTS

10.     On July 1, 2014, the Debtor filed his Chapter 11 case.  On January 9, 2015, Richard M. Pachulski was appointed as the Chapter 11 Trustee in the Case [Docket No. 259].

11.     On December 9, 2015, the Bankruptcy Court entered an order confirming the Plan, which became effective on December 7, 2015.  Pursuant to the Plan (at VII.D), the Plan Administrator assumed the rights of the chapter 11 trustee to implement the Plan and pursue various claims and causes of action.

12.     ***2019 Note*:**  In 2019, Blanchard requested a loan from the Estate to pay reasonable and necessary expenses related to Plenitude Holdings, LLC ("Plenitude"),[2] so that he could

---

[2] Plenitude is a real estate investment partnership between Blanchard-related entities and certain third parties, which partnership has certain interests in respect to a 165-acre property owned by Los Angeles County in Carson, California.

facilitate the disposition of the project for the benefit of the estate.  The Plan Administrator, with input from the Oversight Committee, agreed to loan Blanchard $200,000 for those purposes.  As part of the loan, Blanchard agreed to reimburse the Estate $32,261.94 for payments made to attorneys who represented him personally in connection with the sale of the Seasmoke Project known as Loynes Beach Partners. To memorialize these obligations, on October 2, 2019, Blanchard executed (i) a Promissory Note (the "2019 Note" (a true and correct copy of which is attached hereto as **Exhibit 1**)) wherein he promised to pay $232,261.94, plus interest, to the order of Richard Pachulski, solely in his capacity as the Plan Administrator, and (ii) a Pledge Agreement and Assignment of Interest in favor of the Plan Administrator (true and correct copies of which are attached hereto as **Exhibit 2**).

13.    The maturity date of the 2019 Note was September 30, 2022, and as of that date, the 2019 Note was due and payable in full.  However, upon Blanchard's request for a forbearance, the Plan Administrator entered into a forbearance agreement with Blanchard, effective as of September 30, 2022 (the "Forbearance Agreement" (a true and correct copy of which is attached hereto as **Exhibit 3**)), which agreement provided for the Plan Administrator to forbear from exercising his rights and remedies with respect to the 2019 Note and all other amounts due and payable until December 31, 2022, subject to the terms and conditions set forth in the Forbearance Agreement.   Since the Forbearance Agreement, Blanchard has failed to make any further payments on account of the 2019 Note and other amounts.  The principal, interest and late fees due and owed by Blanchard under the 2019 Note now exceeds at least $321,792.13, which includes accrued interest, default interest, and late fees, but excludes attorneys' fees and expenses to which the Plan Administrator and Estate are also entitled under the 2019 Note.

14.    ***Living Expense Loan:***  Blanchard owes the Estate more than $32,262.45 under the "Living Expense Loan" (together with all obligations owed by Blanchard thereunder, the "Living Expense Loan" or the "Living Expense Loan Obligation").   Section X.C of the Plan (as referenced herein and a copy of pertinent portions of which are attached hereto as **Exhibit 4**) provided Blanchard with the Living Expense Loan in the amount of $220,000 to assist him with his living expenses following the Effective Date.  Based on the Plan, Blanchard made payments and the Estate recouped certain amounts owed under the Living Expense Loan through October 2019.  The Plan (at IX. F) calls

for the Living Expense Loan to be repaid in full before the Plan Administrator files the Plan Consummation Certification that would facilitate Blanchard receiving a discharge in the Chapter 11 Case.  The Living Expense Loan is due and payable in full to the Estate. As of the date hereof, Blanchard still owes at least $32,262.45.

15.    The Living Expense Loan and the 2019 Note and all obligations thereunder owed by Blanchard are, collectively, the Debt Obligations.

16.    By various e-mail communications, the Plan Administrator made demand on Defendant for payment of the Debt Obligations (the "Payment Demands").

17.    Despite Plaintiff's demands, Defendant did not pay all or any portion of the amounts due under the Debt Obligations.

18.    The Plan Administrator is bringing this Adversary Proceeding to enforce and collect upon the Debt Obligations, with respect to which Defendant has no defenses, setoffs, claims or counterclaims, in order to obtain additional funds for distribution to estate creditors.

**V.**

## FIRST CLAIM FOR RELIEF
### (For Breach Of Contract – 2019 Note)

19.    Plaintiff repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

20.    The 2019 Note, together with the Pledge and Forbearance Agreements, are a binding and enforceable contract between the Plan Administrator and Defendant.

21.    Plaintiff complied with its obligations pursuant to the contract except for obligations that were waived, excluded or otherwise not required.

22.    Defendant breached the 2019 Note by failing to pay all amounts due to the Plan Administrator thereunder.

23.    The Plan Administrator and the Estate are entitled to damages from Defendant in an amount equal to (i) the aggregate outstanding principal due under the 2019 Note, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Plan

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Administrator's and Estate's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Defendant's breach of his obligations under the 2019 Note.

24.     As a direct and proximate cause of Defendant's breach of the 2019 Note, the Estate has suffered damages in the total amount of at least $321,792.13, plus an amount equal to all default interest continuing to accrue, plus the Estate's costs of collection.

**VI.**

**SECOND CLAIM FOR RELIEF**
**(For Breach Of Contract – Living Expense Loan Obligation)**

25.     Plaintiff repeats and re-alleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

26.     The Living Expense Loan Obligation is a binding and enforceable contract and obligation of Defendant pursuant to the Plan.

27.     Plaintiff complied with its obligations pursuant to the contract except for obligations that were waived, excluded or otherwise not required.

28.     Defendant breached the Living Expense Loan Obligation by failing to pay all amounts due to the Estate thereunder.

29.     The Estate is entitled to damages from Defendant in an amount equal to (i) the aggregate outstanding principal due under the Living Expense Loan Obligation, plus (ii) all accrued and unpaid interest thereon until the date of payment, plus (iii) an amount equal to the Plan Administrator's and Estate's costs of collection (including all court costs and reasonable attorneys' fees and expenses), for Defendant's breach of his obligations under the Living Expense Loan Obligation.

30.     As a direct and proximate cause of Defendant's breach of the Living Expense Loan Obligation, the Estate has suffered damages in the total amount of at least $32,262.45, plus an amount equal to any and all interest continuing to accrue, plus the Estate's costs of collection.

**WHEREFORE,** the Plan Administrator prays for judgment as follows:

(i)     On his First Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under the 2019 Note,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Plan Administrator's and Estate's costs of collection (including all court costs and reasonable attorneys' fees and expenses);

(ii) On his Second Claim for Relief, damages in an amount to be determined at trial but includes (a) the aggregate outstanding principal due under the Living Expense Loan Obligation, plus (b) all accrued and unpaid interest thereon until the date of payment, plus (c) an amount equal to the Plan Administrator's and Estate's costs of collection (including all court costs and reasonable attorneys' fees and expenses); and

(iii) Such other and further relief as this Court deems just and proper.

DATED: March 15, 2024          PACHULSKI STANG ZIEHL & JONES LLP

By:      /s/ *Jeffrey P. Nolan*  _____
          Teddy M. Kapur
          Jeffrey P. Nolan

Attorneys for Richard M. Pachulski,
Plan Administrator for Bankruptcy
Estate of Randall William Blanchard

# EXHIBIT 1

PROMISSORY NOTE

$232,261.94                                                    October 2, 2019

For value received, the undersigned, Randall Blanchard ("Borrower"), unconditionally promises to pay to the order of Richard Pachulski, solely in his capacity as the Plan Administrator for the bankruptcy estate (the "Estate") of Randall William Blanchard (the "Debtor"), whose case is pending in U.S. Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court"), bearing case number 8:14-bk-14105-SC, and its successors, assigns, or other holders hereof ("Lender"), without any counterclaim, setoff or deduction whatsoever, at Los Angeles, California, or at such other place as Lender may from time to time designate in writing, in lawful money of the United States of America, the principal sum of Two Hundred Thirty Two Thousand Two Hundred Sixty One and 94/100 Dollars ($232,261.94), together with interest thereon as set forth below on the Maturity Date (defined below) and on the terms set forth below.

1.   Stated Interest Rate. Except as otherwise provided in the following paragraphs of this Note, interest shall accrue on the unpaid principal balance outstanding at the rate of Five percent (5.0%) per year ("Stated Interest Rate") based upon a 360-day year consisting of twelve (12) 30-day months.

2.   Payment Amount.  Borrower promises and agrees to pay the principal amount of the Note and unpaid accrued interest thereon on or prior to the Maturity Date.

3.   Due Date. All unpaid principal, accrued interest and all other sums due under this Note shall be paid in full on demand, but if demand is not made, on or before September 30, 2022 (or such other date on which all amounts owing to Lender under this Note become due and payable whether at such stated maturity date, by acceleration or otherwise, the "Maturity Date").  All payments on this Note shall be applied first to costs described below, then accrued interest, and the balance to principal.

4.   Method of Payment.  All payments made on this Note shall be made without setoff or counterclaim in lawful money of the United States of America in either immediately available or next day available funds, free and clear of and without deduction for any taxes, fees or other charges of any nature whatsoever.

5.   Security. This Note is secured by, among other things, a Pledge Agreement and Assignment of Interest (the "Pledge Agreement") of even date herewith.

6.   Prepayment. Borrower may prepay the principal balance of this Note, in part or in full, without incurring a penalty.

7.   Default.  Failure to make any payment of principal and interest, or either of them within 10 days of its due date, or to otherwise perform any obligation contained in the Pledge Agreement or any obligation contained herein shall constitute a default ("Default").



Upon the occurrence of any Default, Lender, at its election, may declare the entire balance of principal and interest of this Note and any other sums due under the Pledge Agreement or other instruments to become immediately due and payable, together with all costs of collection, including, but not limited to, reasonable attorneys' fees and all expenses incurred in connection with protection of, or realization on, the principal balance. Delay or failure to exercise said options shall not constitute a waiver of the right to exercise same at any time thereafter or in the event of any subsequent default.

8.    Default Rate and Late Fee. From and after the occurrence of a Default, and until such Default is cured, all outstanding amounts under this Note shall bear interest at the Stated Interest Rate plus Six Percent (6%) per year ("Default Interest Rate") until all obligations due under said documents are paid in full, and Borrower shall pay a late fee of Twenty Thousand and 00/100 Dollars ($20,000.00) ("Late Fee"). At no time shall the rate of interest charged hereunder exceed the legal rate of interest permitted to be charged by the Lender. In the event any law precludes Lender from charging the interest rate otherwise permitted hereunder the interest rate for the period during which such rate is unlawful shall be the highest rate permitted by law and any excessive interest paid shall be applied toward reduction of the outstanding principal balance.

9.    No Waiver by Lender. The acceptance of any payment hereunder which is less than payment of all amounts then due and payable shall not constitute a waiver of any of the rights or options of the Lender or to the exercise of those rights and options at the time of such acceptance or at any subsequent time.

10.    Waivers by Borrower. To the extent permitted by law, Borrower waives notice of intent to accelerate, demand, presentment for payment, protest and notice of protest, notice of dishonor, and non-payment of this Note and waives any and all lack of diligence , or delays in the collection or enforcement hereof. Borrower waives any right of setoff now or hereafter arising against obligations due the Lender.

11.    Illegality or Invalidity. If any provision of this Note or the application hereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, neither the remainder of this Note nor the application of such provision to any other person or circumstance shall be affected thereby, but rather the same shall be enforced to the greatest extent permitted by law.

12.    **IN THE EVENT THAT AN ACTION AT LAW IS COMMENCED TO ENFORCE ANY OF THE PROVISIONS OF THIS NOTE, THE BORROWER HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY ON ANY TRIABLE ISSUE OF FACT.**

13.    Severability. Every provision hereof is intended to be several. If any provision of this Note is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable, such illegality, invalidity or unenforceability shall not affect the other provisions hereof, which shall remain binding and enforceable.



14.    Miscellaneous. In the event that suit is brought to enforce this Note or an attorney is employed by Lender or other expenses are incurred by Lender to compel payment of this Note or any portion of the indebtedness evidenced hereby, whether or not any suit or other proceeding be commenced, Borrower shall pay all such expenses and actual attorneys' fees, including, without limitation, any attorneys' fees incurred in any negotiation, alternative dispute resolution proceeding subsequently agreed to by the parties, if any, litigation, or bankruptcy proceeding or any appeals from any of such proceedings. This Note shall be construed and enforced in accordance with the laws of the State of California. Borrower acknowledges that any action related to the enforcement of this Note shall be subject to the exclusive jurisdiction of the Bankruptcy Court, and Borrower agrees not to contest the Bankruptcy Court's jurisdiction.

Borrower:

Randall Blanchard

# EXHIBIT 2

## PLEDGE AGREEMENT AND ASSIGNMENT OF INTEREST

THIS PLEDGE AGREEMENT AND ASSIGNMENT OF INTEREST ("Agreement") is made this 2 day of October, 2019 in favor of Richard Pachulski , ("Assignee" or "Plan Administrator"), solely in his capacity as the Plan Administrator for the bankruptcy estate (the "Estate") of Randall William Blanchard (the "Debtor" or "Assignor"), whose case is pending in U.S. Bankruptcy Court for the Central District of California, Santa Ana Division (the "Bankruptcy Court"), bearing case number 8:14-bk-14105-SC.

### RECITALS:

A.    On December 9, 2015, the Bankruptcy Court entered an order confirming the *Fifth Amended Plan of Reorganization Proposed by Chapter 11 Trustee for Randall William Blanchard* (the "Plan"). The Plan became effective on December 7, 2015, and as a result, the Plan Administrator assumed the rights of the chapter 11 trustee to implement the Plan and pursue various claims and causes of action.  The Plan authorizes the Plan Administrator to incur obligations for reasonable and necessary expenses in liquidating and converting Assets of the Estate to Cash.[1]

B.    Assignor has requested a loan from the Estate to pay reasonable and necessary expenses related to that certain Seasmoke Project referred to as Vico, LLC in the Plan and referred to as Plenitude Holdings, LLC, in the Eighth Post-Confirmation Status Report Regarding the Plan, which was filed with the Bankruptcy Court on April 4, 2019 as Docket No. 779 ("Plenitude Holdings").

C.    Assignee, together with the Oversight Committee established pursuant to the Plan, have agreed to loan the Debtor the sum of Two Hundred Thousand and No/100 Dollars ($200,000) (the "Loan") for the payment of expenses related to Plenitude Holdings, so that the Assignor can facilitate the disposition of the project and convert that Asset to Cash for the Estate.

D.    In addition, the Debtor has agreed to reimburse the Estate the amount of Thirty-Two Thousand Two Hundred Sixty-One and 94 Dollars ($32,261.94) (the "Loynes Beach Distribution") for the payment to Gary Waldron, Sherry Bragg, and Jacob Gonzales (collectively, the "Waldron Group") from the proceeds of the sale of another Seasmoke Project known as Loynes Beach Partners, LLC because the services performed by the Waldron Group benefited him personally.

E.    The Loan and the reimbursement for the Loynes Beach Distribution shall be evidenced by a Promissory Note (the "Note") executed by the Debtor in favor of Assignee.

F.    Assignor shall receive substantial and material benefit from the Loan and the Loynes Beach Distribution.

---

[1] Capitalized terms that are undefined in this Agreement shall have the meaning ascribed to them in the Plan.

1

DOCS_LA:324684.5 68704/003

G.    Pursuant to Section VII.A.2 of the Plan, *inter alia*, (i) 100% of the ownership interests in Seasmoke Partners, LLC ("Seasmoke Partners") were deemed to have been conveyed to the Estate effective as of the Petition Date; (ii) fifty percent (50%) of the ownership interests in Seasmoke Partners are held by the Estate in trust for the Debtor, or his nominee, and pledged to the Plan Administrator to secure all of the Debtor's obligations under the Plan; and (iii) the interests of Meryton Management, Inc. in and to the profits of Seasmoke Partners have been canceled.

H.    Assignor has the right to receive distributions from Seasmoke Partners-Studebaker, LLC, a California limited liability company ("Seasmoke-Studebaker"), by virtue of Seasmoke Partners' 73% Class B membership interest in Seasmoke-Studebaker.

I.    Assignor also has the right to receive distributions from Sand Dollar Partners, LLC, a California limited liability company, ("Sand Dollar") by virtue of Seasmoke Partners' 36% membership interest in Sand Dollar, which holds a 100% membership interest in La Quinta Partners 40, LLC, a California limited liability company ("La Quinta").

J.    Assignor has an indirect interest in Plenitude Holdings because Seasmoke-Studebaker holds a 20.04% interest in Plenitude Holdings, and La Quinta holds 30.6% interest in Plenitude Holdings.

K.    True and correct copies of the operating agreements for Seasmoke Partners, Seasmoke-Studebaker, Sand Dollar, La Quinta, and Plenitude Holdings are attached hereto as Exhibits A, B, C, D, and E and incorporated herein by this reference. The organizational ownership chart for Plenitude Holdings is attached hereto as Exhibit F and incorporated herein by this reference.

L.    In order to secure Assignor's performance under Note, Assignor is willing to pledge and unconditionally assign to Assignee and grant Assignee certain personal property hereinafter described.

M.    Unless otherwise defined herein, capitalized terms have the meaning set forth in the Plan.

NOW, THEREFORE, as an inducement to Assignee to make the Note, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

## AGREEMENTS:

I.    INCORPORATION OF RECITALS.

The Assignor agrees and represents that the foregoing recitals are true and accurate as of the date hereof and are incorporated herein as an integral part of this Agreement.

II.    ASSIGNMENT AND GRANT OF SECURITY INTEREST

2

DOCS_LA:324684.5 68704/003

2.1     As used herein, "Interest" shall mean and include all of Assignor's right, title, and interest in the following:

(a)     all of Assignor's distribution interests (directly and indirectly), dividends, title, privileges, benefits, licenses, liberties, profits, avails, issues and other interests (of whatever nature) in and to Plenitude Holdings, Seasmoke-Studebaker, La Quinta, Sand Dollar and Seasmoke Partners (collectively, the "Pledged Entities"), together with all Proceeds (as hereinafter defined), including, without limitation all income therefrom, collections thereon or distributions with respect thereto. As used herein, the term "Proceeds" shall mean "proceeds," as such term is defined in the Uniform Commercial Code as enacted in California ("Code") and, in any event, shall include, but not be limited to, (i) any and all payments (in any form whatsoever) made or due and payable to Assignor from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the Interest by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), (ii) any and all amounts (in any form whatsoever) made or due and payable to Assignor in connection with any sale or other disposition of the Pledged Entities, and (iii) any and all other amounts (in any form whatsoever) from time to time paid or payable to Assignor in connection with the Pledged Entities.

(b)     all of Assignor's right, title and interest, if any, to participate directly or indirectly in the management and voting of the Pledged Entities;

(c)     all of Assignor's right, title and interest as a manager or indirect owner of any of the Pledged Entities, including, without limitation, all of Assignor's right to receive distributions at any time or from time to time of cash and other property, real, personal or mixed, from any of the Pledged Entities upon complete or partial liquidation of such entities, or otherwise;

(d)     all of Assignor's right, title and interest in specific property of the Pledged Entities;

(e)     all of Assignor's right, title and interest in and to: (i) all rights, privileges, authority and power of Assignor as owner and holder of the items specified in this Section 2.1, including, but not limited to, all contract rights related thereto; (ii) all options and other agreements for the purchase or acquisition of any interest in the Pledged Entities; and (iii) any document or certificate representing or evidencing Assignor's rights and interests in the items specified in this Section 2.1; and

(f)     to the extent not otherwise included, all of Assignor's interest in the Proceeds and products of any of the foregoing.

2.2     In consideration of the Loan evidenced by the Note and the Loynes Beach Distribution and as security for the prompt and complete payment and performance when due of the Obligations (defined below), Assignor hereby grants to Assignee a security

3



interest in and pledges to Assignee all of Assignor's right, title and interest in and to the Interest.

   2.3 This Agreement and the rights hereby granted shall secure all obligations of Assignor to Assignee described in the Note and in this Agreement (and any renewals, extensions, or modifications thereof) (collectively, the "Obligations").

III. ASSIGNOR'S REPRESENTATIONS AND WARRANTIES

   As an inducement to Assignor to make the Note, Assignor hereby represents and warrants as follows, which representations and warranties shall be true as of the date hereof and shall remain true throughout the term of the Loan:

   3.1 The Pledged Entities maintain their principal offices at 2222 Martin Street, Suite 160, Irvine, CA 92612. The Pledged Entities maintain records concerning the Interest at the address set forth above. Assignor shall promptly notify Assignee of any change in such address.

   3.2 Assignor is a member of Seasmoke Partners.

   3.3 Assignor has the right to receive distributions from Seasmoke-Studebaker by virtue of Seasmoke Partners' 73% Class B membership interest in Seasmoke-Studebaker.

   3.4 Assignor has the right to receive distributions from Sand Dollar by virtue of Seasmoke Partners' 36% membership interest in Sand Dollar, which holds a 100% membership interest in La Quinta.

   3.5 Assignor has an indirect interest in Plenitude Holdings because Seasmoke-Studebaker holds a 20.04% interest in Plenitude Holdings, and La Quinta holds 30.6% interest in Plenitude Holdings.

   3.6 True and correct copies of the operating agreements for Seasmoke Partners, Seasmoke-Studebaker, Sand Dollar, La Quinta, and Plenitude Holdings are attached hereto as Exhibits A, B, C, D, and E (the "Organizational Documents"). The Organizational Documents were duly executed and delivered, are in full force and effect, and binding upon and enforceable against the parties thereto in accordance with their terms.

   3.7 An accurate organizational ownership chart for Plenitude Holdings is attached hereto as Exhibit F and incorporated herein by this reference.

   3.8 Assignor, directly or indirectly, controls the net profits and losses of Seasmoke-Studebaker, Sand Dollar, La Quinta, and Seasmoke Partners including the same interest in all distributions by Seasmoke-Studebaker, Sand Dollar, La Quinta, and Seasmoke Partners to its members of cash or other property, whether in complete or partial liquidation of such entities.

4



3.9    Assignor is entitled to make this assignment and transfer to Assignee.

3.10    Assignor has obtained all necessary consent (if required) and authority for the transfer by Assignor of the Interest.

3.11    Assignor is the sole owner of the Interest assigned hereby, free from all liens, claims, encumbrances and rights of others, and Assignor shall not execute or permit the filing of any other such interest or financing statement thereon. Assignor shall defend the Interest against all claims and demands of all persons.

3.12    Upon the filing of all appropriate financing statements in the appropriate filing offices under the Code, all steps will have been taken necessary to create and perfect the security interest created by this Agreement as a valid and continuing first lien on and first perfected security interest in the Interest in favor of Assignee, prior to all other liens, security interests and other claims of any sort whatsoever. This Agreement and the security interest created hereby are enforceable as such against creditors of and purchasers from Assignor except with respect to liens or other interests accorded a superior priority as a matter of Law.

3.13    This Agreement shall remain in full effect, without waiver or surrender of any of Assignee's rights hereunder, notwithstanding any one or more of the following:

　　　(a)    Extension of the time of payment of the whole or any part of the Note or any of the Obligations;

　　　(b)    Any change in the terms and conditions of the Note or any of the Obligations.

　　　(c)    Acceptance by Assignee of any Interest or security of any kind for the payment of the Note or the Obligations, any and all extensions, or renewals thereof;

　　　(d)    Surrender, release, exchange, or alteration of any Interest or other security, either in whole or in part; or

　　　(e)    Release, settlement, discharge, compromise, change, or amendment, in whole or in part, of any claim of Assignee against Assignor or of any claim against any guarantor or other party secondarily or additionally liable for the payment of the Note or any of the Obligations.

IV.    COVENANTS

Assignor covenants and agrees that from and after the date of this Agreement and until the Obligations are fully satisfied:



4.1     Assignor agrees to take no action which would adversely affect the value of the Interest or which would encumber, dilute, or cloud Assignor's title or interest therein.

4.2     Assignor shall not take any action at any time to defeat Assignee's perfected security interest in the Interest that shall be prior to any other interests therein.

4.3     Assignor will not at any time claim, take, insist upon or invoke the benefit or advantage of or from any law now or hereafter in force providing for the valuation or appraisal of the Interest prior to any sale or sales thereof to be made pursuant to the provisions hereof or pursuant to the decree, judgment or order of any court of competent jurisdiction; nor, after such sale or sales, claim or exercise any right under any statute now or hereafter made or enacted by any state to redeem the property so sold or any part thereof, and Assignor hereby expressly waives, on behalf of Assignor and each and every person claiming by, through and under Assignor, all benefit and advantage of any such law or laws, and covenants that Assignor will not invoke or utilize any such law or laws or otherwise hinder, delay or impede the execution of any power, right or remedy herein or hereby granted to Assignee, but will authorize, allow and permit the execution of every such power, right or remedy as though no such law or laws had been made or enacted.

4.4     Assignor agrees immediately to deliver to Assignee, or Assignee's designee, all certificates, instruments or other documents evidencing any of the Interest which may at any time come into the possession of Assignor. If Assignor fails to comply with terms of this Agreement, effective upon prior written notice by Assignee, Assignor hereby appoints Assignee as Assignor's attorney-in-fact with authority at any time or times to take any of the foregoing actions on behalf of Assignor.  The Assignor acknowledges that this power of attorney is coupled with an interest, in that the Assignee has an interest in the Interest, and that as a result, in addition to any other consequences under law, this power is irrevocable and will survive Assignor's death or incompetence for as long as any of the Obligations are outstanding.  Assignor agrees that this Agreement or a photocopy of this Agreement shall be sufficient as a financing statement.

4.5     Assignee may, at its option, and without any obligation to do so, pay, perform, and discharge any and all amounts, costs, expenses, and liabilities herein agreed to be paid or performed by Assignor, and all amounts expended by Assignee in so doing or in respect of or in connection with the Interest shall become part of the Obligations and shall be immediately due and payable by Assignor to Assignee upon demand therefor and shall bear interest at the rate of interest in effect after default on the indebtedness outstanding under the Note. Assignor further agrees to pay Assignee on demand all costs and expenses, including reasonable attorneys' fees, incurred by Assignee in the preservation, realization, enforcement and exercise of the rights, powers and remedies of Assignee and the obligations of Assignor hereunder.

4.6     Assignor will not at any time (i) suffer or permit any amendment or modification of the operating agreements for the Pledged Entities (the "Operating

6

DOCS_LA:324684.5 68704/003



Agreements") without the prior written consent of Assignee (which consent may be withheld, delayed, or denied in the Assignee's sole discretion), or (ii) waive, release or compromise any rights or claims Assignor may have against any other party which arise under the Operating Agreements.

4.7    Assignee shall have the right at any time after the occurrence of an Event of Default (defined below) by Assignor to notify any and all account debtors and Assignor to make any payments otherwise due to Assignor with regard to the Interest directly to Assignee. After Assignee's election, Assignor shall not receive or hold any of the proceeds of Interest and if any of the proceeds are received by Assignor, Assignor shall receive the same as trustee for Assignee and shall immediately and on the same day properly endorse and deliver the same in kind to Assignee without cashing or commingling the same. Any notices or claims relative to such proceeds which are received by Assignor shall be delivered to Assignee immediately on receipt of the same.

4.8    In the event Assignor shall, as a result of its ownership of the Interest, become entitled to receive or shall receive any interest, option or rights, whether in addition to, in substitution of, as a conversion of, or in exchange for the Interest, or any portion thereof, or otherwise in respect thereof, Assignor shall accept the same as Assignee's trustee, and Assignor shall hold the same in trust for the benefit of Assignee. If any sums of money or property so paid or distributed with respect to the Interest shall be received by Assignor, Assignor shall, until such money or property is paid or delivered to Assignee, hold such money or property in trust for the benefit of Assignee.

4.9    Without the prior written consent of Assignee (which will not be unreasonably withheld, conditioned, or delayed), Assignor shall not (i) vote to enable, or take any other action to permit, Assignor to sell any interests or equity securities of any nature or to issue any other securities convertible into or granting the right to purchase or exchange for any interest or equity securities of Assignor, or (ii) sell, assign, transfer, exchange or otherwise dispose of, or grant any option with respect to, the Interest, or (iii) create, incur any option with respect to, any of the Interest, or any interest therein, except for the lien provided for by this Agreement.

4.10    At any time and from time to time, upon the written request of Assignee, and at the sole expense of Assignor, Assignor will promptly and duly execute and deliver any and all such further instruments and documents and take such further actions as Assignee may deem necessary or desirable in the exercise of its commercially reasonable judgment to obtain the full benefits of this Agreement and of the rights and powers herein granted, including, without limitation, the execution and filing of any financing or continuation statements under the Uniform Commercial Code in effect in any jurisdiction with respect to the security interest granted hereby. Assignor also hereby authorizes Assignee to file any such financing or continuation statement without the signature of Assignor to the extent otherwise permitted by applicable Law.  If any amount payable under or in connection with any of the Interest shall be or become evidenced by any promissory note or other instrument (other than an instrument which constitutes chattel paper under the Code), such note or instrument shall be immediately

7



pledged hereunder and a security interest therein hereby granted to Assignee and shall be duly endorsed without recourse or warranty in a manner reasonably satisfactory to Assignee and delivered to Assignee.

4.11   Assignor shall, unless otherwise directed in writing by Assignee, appear in and defend the right, title and interest hereunder of Assignee, as a first priority security interest in the Interest, against any liens, claims, encumbrances and rights of all other Persons whatsoever.

4.12   Assignor agrees that, on reasonable request, Assignor will deliver to Assignee copies of all of Assignor's records and files relating to the Interest, Assignor, any property (real or leasehold) owned by the Pledged Entities (the "Property"), and agrees that Assignee may examine, inspect and copy the same at all reasonable times wherever the same may be located. Assignor hereby authorizes all persons and organizations having records or files pertaining to such Interest to furnish information to Assignee with regard thereto and to allow Assignee to inspect and copy all such records.

4.13   Assignor shall not without the prior written consent of Assignee cause a transfer of all or any part of the Interest.

4.14   Assignor shall not grant or permit the filing of any lien or encumbrance on the Interest without the prior written consent of Assignee.

4.15   Except as expressly permitted under this Agreement, Assignor shall not, without Assignee's prior written consent, incur additional indebtedness secured by the Interest.

## V.   ASSIGNEE'S APPOINTMENT AS ATTORNEY-IN-FACT

(a)   Assignor hereby irrevocably constitutes and appoints Assignee and each officer or agent of Assignee with full power of substitution, as Assignor's true and lawful attorney-in- fact with full irrevocable power and authority in the place and instead of Assignor and in the name of Assignor or in such attorney-in-fact's own name, from time to time in the discretion of each such attorney-in-fact following the occurrence of an event of default under the Note, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this Agreement and, without limiting the generality of the foregoing, hereby gives each such attorney-in-fact the power and right, from and after an Event of Default (defined below), on behalf of Assignor, without notice to or assent by Assignor, to do the following:

(1)   to collect and otherwise take possession of and title to any and all distributions of cash or other property due or distributable at any time after the date hereof to Assignor on account of the Interest, whether in complete or partial liquidation or otherwise, and to prosecute or defend any

8



action or proceeding in any court of law or equity or otherwise deemed appropriate by such attorney-in-fact for the purpose hereof;

(2)    to ask, demand, collect, receive and give acceptances and receipts for any and all moneys due and to become due under the Interest and, in the name of Assignor or such attorney-in-fact's own name or otherwise, to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of moneys due under the Interest and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by such attorney-in-fact for the purpose of collecting any and all such moneys due under the Interest whenever payable;

(3)    (A) to direct any party liable for any payment under any of the Interest to make payment of any and all moneys due and to become due thereunder directly to Assignee or as such attorney-in-fact shall direct; (B) to receive payment of and receipt for any and all moneys, claims and other amounts due and to become due at any time in respect of or arising out of any Interest; (C) to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect the Interest or any portion thereof and to enforce any jurisdiction to collect the Interest or any portion thereof and to enforce any other right in respect of any Interest; (D) to defend any suit, action or proceeding brought against Assignor with respect to any Interest; (E) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as such attorney-in-fact may deem appropriate; and (F) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Interest as fully and completely as though such attorney-in-fact were the absolute owner thereof for all purposes, and to do, at the option of such attorney-in-fact at Assignor's expense, at any time, or from time to time, all acts and things which such attorney-in-fact reasonably deems necessary to protect, preserve or realize upon the Interest and the security interest of Assignee therein, in order to effect the intent of this Agreement, all as fully and effectively as Assignor might do.

(b)    Assignor hereby ratifies, to the extent permitted by law, all that said attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

(c)    The powers conferred on each attorney-in-fact hereunder are solely to protect the interest in the Interest of Assignee and shall not impose any duty upon any such attorney-in-fact to exercise any such powers. Each such attorney-in-fact shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents

9



shall be responsible to Assignor for any act or failure to act unless such action or failure to act constitutes gross negligence.

        **(d)**    Assignor also authorizes Assignee and each officer or agent of Assignee at any time and from time to time upon the occurrence of any Event of Default, to execute, in connection with a sale provided for in <u>Section V</u> of this Agreement, any endorsements, assignments or other instruments of conveyance or transfer with respect to any of the Interest.

## VI.    <u>EVENTS OF DEFAULT</u>

Assignor shall be in default hereunder if any of the following shall occur (each an "<u>Event of Default</u>"):

        **(a)**    Assignor's failure to make any payment of interest or principal within five (5) days of when due under the Note or any other obligation owed by Assignor to Assignee.

        **(b)**    The failure of Assignor to perform any covenant/obligation, whether under the Note, this Agreement, or under the terms of any other agreement, note, or instrument, now or hereafter existing, as and when due, whether at maturity or by acceleration within fifteen (15) days of receiving written demand from the Assignee.

        **(c)**    Any representation or warranty made by Assignor in connection with the Note, the Loan, this Agreement, or any document or agreement made or submitted in connection herewith, is false or misleading.

        **(d)**    Assignor shall commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to themselves or their respective debts under any Bankruptcy, insolvency or other similar debtor relief law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of them, or any of them, or any substantial part of their property, or shall consent to any such relief or to the appointment or taking possession by any such official in any involuntary case or other proceeding commenced against any of them.

        **(e)**    An involuntary case or other proceeding shall be commenced against Assignor, seeking liquidation, reorganization or other relief with respect to themselves or their respective debts under any bankruptcy, insolvency or other similar debtor relief law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of them, or any substantial part of their property, and such involuntary case or other proceeding shall remain un-dismissed and un-stayed for a period of one hundred sixty ( 160) days.



(f)    Assignor shall make an assignment for the benefit of creditors, or admit in writing the inability to pay their debts generally as they become due.

## VII.   ASSIGNEE'S REMEDIES.

(a)    Upon the occurrence of any Event of Default, Assignee or Assignee's designee may, at Assignee's option, elect to assume all of Assignor's rights, claims and interests in Seasmoke Partners and become a substituted member of Seasmoke Partners, Sand Dollar, La Quinta and Seasmoke-Studebaker, and Assignor shall execute or cause to be executed all documents necessary to evidence Assignee so becoming a substituted member. Thereafter, Assignor shall have no further interest or rights in or to the Interest. Notwithstanding that this document is also a security agreement, Assignee may, at its option, enforce this document as an absolute assignment, without resort to any enforcement provisions or requirements under the Code.

(b)    In the alternative, if any Event of Default shall occur, Assignee or Assignee's designee may exercise in addition to all other rights and remedies granted to them in this Agreement and in any other instrument or agreement securing, evidencing or relating to the Obligations, all rights and remedies of a secured party under the Code. Without limiting the generality of the foregoing, Assignor expressly agrees that in any such event, Assignee, without demand of performance or other demand, advertisement or notice of any kind (except the notice specified below of time and place of public or private sale) to or upon Assignor or any other person (all and each of which demands, advertisements and/or notices are hereby expressly waived), may forthwith collect, receive, appropriate and realize upon that Interest, or any part thereof and/or may forthwith sell, lease, assign, give option or options to purchase, or sell or otherwise dispose of and deliver said Interest (or contract to do so), or any part thereof at public or private sale or sales, at any exchange or broker's board or at any of Assignee's offices or elsewhere at such prices as it may deem best, for cash or on credit or for future delivery without the assumption of any credit risk. Assignor expressly acknowledges that private sales may be less favorable to a seller than public sales but that private sales shall nevertheless be deemed commercially reasonable and otherwise permitted hereunder. In view of the fact that federal and state securities laws and/or other applicable laws may impose certain restrictions on the method by which a sale of the Interest may be effected, Assignor agrees that upon the occurrence of an Event of Default, Assignee may, from time to time, attempt to sell all or any part of the Interest by means of a private placement, restricting the prospective purchasers to those who will represent and agree that they are purchasing for investment only and not for distribution. In so doing, Assignee may solicit offers to buy the Interest, or any part thereof, for cash, from a limited number of investors deemed by Assignee in its judgment, to be financially responsible parties who might be interested in purchasing the Interest, and if Assignee solicits such offers, then the acceptance by Assignee of the highest offer obtained therefrom shall be deemed to be a commercially reasonable method of disposing of the Interest.

11

DOCS_LA:324684.5 68704/003



(c)      Assignee or Assignee's designee shall have the right upon any such public sale or sales, and, to the extent permitted by law, upon any such private sale or sales, to purchase the whole or any part of said Interest so sold, free of any right or equity of redemption, which equity of redemption Assignor hereby releases. Assignor further agrees, at the request of Assignee, to assemble the Interest and make it available to Assignee at places which Assignee shall reasonably select, whether at Assignor's premises or elsewhere. Assignee shall apply the net proceeds of any such collection, recovery, receipt, appropriation, realization or sale as provided in Section VII.(f) of this Agreement. Only after so paying over such net proceeds and after the payment by Assignee of any other amount required by any provision of law, need Assignee account for the surplus, if any, to Assignor. To the extent permitted by applicable law, Assignor waives all claims, damages, and demands against Assignee arising out of the repossession, retention or sale of the Interest.  Assignor agrees that Assignee need not give more than ten (10) days' notice (which notification shall be deemed given when mailed or delivered on an overnight basis, postage prepaid, addressed to Assignor at its address referred to in Section 6.8 hereof) of the time and place of any public sale or of the time after which a private sale may take place and that such notice is reasonable notification of such matters.

(d)      Assignor also agrees to pay all costs of Assignee, including reasonable attorneys' fees and expenses, incurred with respect to the collection of any of the Obligations or the enforcement of any of Assignee's rights hereunder.

(e)      Assignor hereby waives presentment, demand, or protest (to the extent permitted by applicable law) of any kind in connection with this Agreement or any Interest. Except for notices provided for herein, Assignor hereby waives notice (to the extent permitted by applicable law) of any kind in connection with this Agreement.

(f)      The proceeds of any sale, disposition or other realization upon all or any part of the Interest shall be distributed by Assignee in the following order of priorities:

(1)      first, to Assignee in an amount sufficient to pay in full the expenses of Assignee in connection with such sale, disposition or other realization, including all expenses, liabilities and advances incurred or made by Assignee in connection therewith, including reasonable attorneys' fees and expenses;

(2)      second, to Assignee until the other Obligations are paid in full; and

(3)      finally, upon payment in full of all of the Obligations, to Assignor, or Assignor's representative or as a court of competent jurisdiction of Assignor may direct.

12



(g)      Assignor agrees to indemnify and hold harmless Assignee, its directors, officers, employees, agents and parent, and subsidiary corporations, and each of them from and against any and all liabilities, obligations, claims, damages, or expenses incurred by any of them arising out of or by reason of entering into this Agreement or the consummation of the transactions contemplated by this Agreement and to pay or reimburse Assignee for the fees and disbursements of counsel incurred in connection with any investigation, litigation or other proceedings (whether or not Assignee is a party thereto) arising out of or by reason of any of the aforesaid. Assignee will promptly give Assignor written notice of the assertion of any claim which Assignee believes is subject to the indemnity set forth in this paragraph and will upon the request of Assignor promptly furnish Assignor with all material in its possession relating to such claim or the defense thereof to the extent that Assignee may do so without breach of duty to others. Any amounts properly due under this paragraph shall be payable to Assignee immediately upon demand.  This provision shall survive the repayment of the Note and any termination of this Agreement and shall continue in full force and effect so long as the possibility of such liability, claims or losses exists.

VIII.   <u>LIMITATION ON ASSIGNEE'S DUTY IN RESPECT OF INTEREST.</u>

Except as expressly provided in the Code, Assignee shall have no duty as to any Interest in its possession or control or in the possession or control of any agent or nominee of Assignee or as to any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto.



DOCS_LA:324684.5 68704/003

## IX. NO ASSIGNEE LIABILITY.

Assignee shall not be liable for the consequence of any voting rights cast or given in good faith, and Assignor acknowledges and agrees that the exercise of the voting rights by Assignee with the objective of protecting Assignee's rights or interest in the Interest shall be deemed to be cast or given in good faith. The powers conferred on Assignee hereunder are solely to protect its interest in the Interest and shall not impose any duty upon it to exercise or refrain from exercising any such powers. Assignee shall be deemed to have exercised reasonable care in the custody and preservation of any of the Interest in its possession if such Interest is accorded treatment substantially equal to that which Assignee accords its own property. Further, and without limiting the foregoing, Assignee shall be deemed to have exercised reasonable care in the custody and preservation of any of the Interest, if it takes such action for that purpose as Assignor reasonably requests in writing, but failure of Assignee to comply with any such request at any time shall not be deemed a failure to exercise reasonable care. The trustees, members, officers, directors, employees and agents of Assignee shall have no personal liability under this Agreement, and any obligation of Assignee to Assignor under or in respect of this Agreement or the Interest shall be satisfied solely from Assignee's interest in the Interest.

## X. MISCELLANEOUS PROVISIONS.

10.1    Assignor agrees to indemnify Assignee against all losses, claims, demands, and liabilities of every kind caused by the Interest subject hereto; to pay all expenses, including attorneys' fees incurred by Assignee in the preservation, realization, enforcement and exercise of rights, powers, and remedies of Assignee or obligations of Assignor hereunder.   This provision shall survive the repayment of the Note and any termination of this Agreement and shall continue in full force and effect so long as the possibility of such liability, claims or losses exists.

10.2    It is understood and agreed that Assignee does not assume and shall not be subject to any duty, undertaking, obligation or liability of Assignor under any Interest in which Assignee is granted a security interest hereunder.

10.3    No default hereunder by Assignor shall be deemed to have been waived by Assignee except by a writing to that effect signed by Assignee; no waiver of any default shall operate as a waiver of any other default on a future occasion. No modification, rescission, waiver, release, or amendment of any provision of this Agreement shall be made except by a written agreement signed by Assignor and Assignee.

10.4    Should any one or more provisions of this Agreement be determined to be illegal or unenforceable, such provision or provisions shall be modified to the minimum extent necessary to make it or its application valid and enforceable, and all other provisions nevertheless shall be effective.

14



10.5    Assignor recognizes that in the event Assignor fails to perform, observe or discharge any of Assignor's obligations hereunder, no remedy of law will provide adequate relief to Assignee, and Assignor agrees that Assignee shall be entitled to temporary and permanent injunctive relief in any such case without the necessity of proving actual damages.

10.6    Assignor shall have no rights of subrogation as to any of the Interest until full, complete and indefeasible satisfaction and performance and payment of all Obligations.

10.7    ASSIGNOR AND ASSIGNEE, BY ITS ACCEPTANCE OF THIS ASSIGNMENT, HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, OR RELATED TO, THE SUBJECT MATTER OF THIS ASSIGNMENT AND THE BUSINESS RELATIONSHIP THAT IS BEING ESTABLISHED. THIS WAIVER IS KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, MADE BY ASSIGNOR AND ASSIGNEE, AND ASSIGNOR ACKNOWLEDGES THAT NEITHER ASSIGNEE NOR ANY PERSON ACTING ON BEHALF OF ASSIGNEE HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. ASSIGNOR AND ASSIGNEE ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS ASSIGNMENT, THAT EACH OF THEM HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS ASSIGNMENT AND THAT EACH OF THEM WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. ASSIGNOR AND ASSIGNEE FURTHER ACKNOWLEDGE THAT THEY HAVE BEEN REPRESENTED (OR HAVE HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS ASSIGNMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL.

10.8    Except as otherwise provided by law, all notices to be given pursuant to this Agreement shall be sufficient if given by personal services, by guaranteed overnight delivery services, by email or telecopy or by being mailed postage prepaid, certified or registered mail return receipt requested, to the described addresses of the parties hereto as set forth below, or to such other address as a party may request in writing. Any time period provided in the giving of any notice hereunder shall commence upon the date of personal service, the date after delivery to the guaranteed overnight delivery service, the date of sending the email or telecopy or two (2) days after mailing certified or registered mail.

If to Assignor:      Randal Blanchard.
2222 Martin Street, Suite 160
Irvine, CA 92612
Email: randy@roncorg.com and
randy@sanddollarpartners.com

If to Assignee:      Richard Pachulski, Blanchard Plan Administrator
c/o Pachulski, Stang, Ziehl & Jones LLP

15

DOCS_LA:324684.5 68704/003



10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Email: tkapur@pszjlaw.com
Attention: Teddy M. Kapur, Esq.

10.9    The terms herein shall have the meanings in and be construed under the Code and all issues arising hereunder shall be governed by the laws of the State of California.

10.10    Assignor acknowledges and agrees that any and all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, related to or from this Agreement shall be subject to the exclusive jurisdiction of the Bankruptcy Court, and Assignor agrees not to contest the Bankruptcy Court's jurisdiction.

10.11    All rights, remedies, and privileges of Assignee hereunder shall be cumulative and not alternative and shall, whether or not specifically so expressed, inure to the benefit of Assignee, its successors and assigns, and all obligations of Assignor shall bind its successors and legal representatives.

10.12    Assignee and Assignor as used herein shall include the heirs, executors or administrators, or successors or assigns of those parties. The provisions of this Agreement shall apply to the parties according to the context hereof and without regard to the number or gender or words and expressions used herein.

IN WITNESS WHEREOF, the undersigned has caused this Agreement to be duly executed as of the date first written by the Assignor.

Randall Blanchard

16

# EXHIBIT 3

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (this "Agreement") dated as of the 30th day of September, 2022 (the "Effective Date") is made by and between Randall Blanchard ("Borrower") and Richard Pachulski, solely in his capacity as the Plan Administrator for the bankruptcy estate of Randall William Blanchard, whose case is pending in U.S. Bankruptcy Court for the Central District of California, Santa Ana Division, bearing case number 8:14-bk-14105-SC (the "Bankruptcy Court"), and its successors, assigns, or other holders hereof ("Lender"). Borrower and Lender together may be referred to jointly in this Agreement as the "Parties."

## RECITALS

A. Borrower is the borrower of indebtedness in the principal amount of $232,261.94 (the "Loan"), extended pursuant to that certain Promissory Note (the "Note") dated October 2, 2019, payable to Lender. The Loan is secured by security interests, pledges and other liens upon various collateral granted by Borrower pursuant to that certain Pledge Agreement and Assignment of Interest (the "Pledge Agreement") dated October 2, 2019, made by Borrower in favor of Lender, and those certain other instruments and agreements delivered by or on behalf of Borrower in connection with the Loan (collectively with this Agreement, the Note, and the Pledge Agreement, the "Loan Documents").

B. The Loan was originally scheduled to mature, and the balance, together with all accrued and unpaid interest and all other amounts payable under the Note, was due and payable in full on September 30, 2022.

D. Borrower has requested that Lender forbear from exercising its rights and remedies under the Note and other Loan Documents, in connection with Borrower's obligation to repay the Loan in full, along with and all accrued and unpaid interest and all other amounts due and payable to Lender (such amounts together, the "Obligations").

E. Lender desires to forbear from enforcement of its remedies in respect of the Obligations upon the terms and conditions and to the extent set forth in this Agreement.

NOW THEREFORE, subject to the terms and conditions set forth herein, for and in consideration of the promises set forth herein together with other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1. Recitals; Defined Terms. The Parties hereto acknowledge that the above Recitals are true and correct in all respects and agree that the same are incorporated herein. Unless otherwise specifically defined herein, each term used herein which is defined in the Loan Documents shall have the meaning assigned to such term in the Loan Documents.

2. Forbearance. Subject to the satisfaction of the condition set forth in subsection (a) below, and of the other terms and conditions of this Agreement, Lender agrees not to exercise its remedies on the basis of the maturity of the Obligations under the Loan Documents through December 31, 2022.



a. *Condition to Effectiveness.* The Effective Date shall be deemed to occur if by September 30, 2022 Borrower has paid to Lender $46,290.93, such amount being all accrued and unpaid Stated Interest through September 30, 2022 and one half of the amount of the Late Fee provided for in the Note.

3. <u>Default Rate.</u> The Parties acknowledge and agree that from and after September 30, 2022, all outstanding amounts due under the Note shall bear interest at the Stated Interest Rate plus Six Percent (6%) per year ("<u>Default Interest Rate</u>") until all obligations due under the Loan Documents are paid in full. At no time shall the rate of interest charged hereunder exceed the legal rate of interest permitted to be charged by the Lender. In the event any law precludes Lender from charging the interest rate otherwise permitted hereunder the interest rate for the period during which such rate is unlawful shall be the highest rate permitted by law and any excessive interest paid shall be applied toward reduction of the outstanding principal balance.

4. <u>Other Terms and Conditions.</u> This forbearance is granted conditioned on the following: (i) if not sooner terminated pursuant to the terms of this Agreement, the forbearance shall automatically terminate on December 31, 2022, and Lender shall be entitled to exercise its available rights and remedies under the Loan Documents without further notice; (ii) except as limited and/or modified by this Agreement and by the documents executed in connection herewith, the Loan Documents shall be deemed to be in full force and effect during the period of this Agreement, and all provisions of the Loan Documents relating to the rights and remedies of Lender shall continue to be in effect until such time as all Obligations have been finally paid in full; (iii) Lender shall have no obligation to extend or continue the forbearance beyond December 31, 2022; (iv) notwithstanding the forbearance granted by this Agreement, Lender may still exercise any and all remedies under the Loan Documents and under applicable law, to the extent of any default by Borrower under the Loan Documents other than as relates to maturity of the Obligations under the Loan Documents; and (v) the forbearance set forth in this Agreement is subject to compliance by Borrower with all of the provisions of this Agreement.

5. <u>Ratification and Reaffirmation.</u> Borrower hereby agrees as follows:

a. The Borrower hereby acknowledges and consents to all of the terms and conditions of this Agreement and the Loan Documents and hereby ratifies and reaffirms the Loan Documents. The Borrower hereby represents and acknowledges that it has no claims, counterclaims, offsets, credits or defenses to the Loan Documents or the performance of its obligations thereunder. The Borrower agrees that nothing contained in this Agreement or the Loan Documents shall adversely affect any right or remedy of Lender under the Loan Documents. The Borrower hereby agrees that all references to the "Obligations" in the Loan Documents shall include, without limitation, the obligations of Borrower to Lender under the Loan Documents, modified hereby. The Borrower hereby represents and acknowledges that the execution and delivery of this Agreement and the other Loan Documents executed in connection herewith shall in no way change or modify its obligations under the Loan Documents and shall not constitute a waiver by Lender of any of Lender's rights against the Borrower.



b.  The Borrower hereby represents and warrants to Lender that the execution, delivery and performance of this Agreement and any and all Loan Documents executed and/or delivered in connection herewith will not violate any contract, document or agreement to which Borrower is a party.

c.  Nothing contained herein shall be construed as a waiver by Lender of any covenant or provision of any Loan Document, this Agreement, or of any other contract or instrument between the Borrower and Lender, and Lender's failure at any time or times hereafter to require strict performance by the Borrower of any provision thereof shall not waive, affect or diminish any right of Lender to thereafter demand strict compliance therewith. Lender hereby reserves all rights granted under the Loan Documents, this Agreement and any other contract or instrument between the Borrower and Lender.

d.  All representations and warranties made in any of the Loan Documents, including, without limitation, any document furnished in connection with this Agreement, shall survive the execution and delivery of this Agreement and the Loan Documents, and no investigation by Lender or any closing shall affect the representations and warranties or the right of Lender to rely upon them.

6.  Severability.  Any provision of this Agreement held by a court of competent jurisdiction to be invalid or unenforceable shall not impair or invalidate the remainder of this Agreement and the effect thereof shall be confined to the provision so held to be invalid or unenforceable.

7.  Successors and Assigns.  This Agreement is binding upon and shall inure to the benefit of Lender and Borrower and their respective successors and assigns, except that Borrower may not assign or transfer any of its rights or obligations hereunder without the prior written consent of Lender, which Lender may grant or withhold in his sole discretion. Any assignment by Borrower of its rights or obligations hereunder (even with Lender's consent) will not be deemed to release or limit in any way Borrower's obligations under the Loan Documents.

8.  Counterparts.  This Agreement may be executed by one or more of the Parties hereto in any number of separate counterparts, each of which when so executed shall be deemed to be an original, but all of which when taken together shall constitute one and the same instrument.

9.  Effect of Waiver.  No consent or waiver, express or implied, by Lender to or for any breach of or deviation from any covenant or condition by the Borrower shall be deemed a consent to or waiver of any other breach of the same or any other covenant, condition or duty.

10. Headings.  The headings, captions, and arrangements used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

11. Applicable Law. This Agreement shall be governed by the laws of the State of California. The Parties acknowledge and agree that any and all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, related to or from this Agreement shall be subject to the exclusive jurisdiction of the Bankruptcy Court.



12. Final Agreement.   THIS AGREEMENT REPRESENTS THE ENTIRE EXPRESSION OF THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF ON THE DATE THIS AGREEMENT IS EXECUTED.  THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.  NO MODIFICATION, RESCISSION, WAIVER, RELEASE OR AMENDMENT OF ANY PROVISION OF THIS AGREEMENT SHALL BE MADE, EXCEPT BY A WRITTEN AGREEMENT SIGNED BY BORROWER AND LENDER.

IN WITNESS WHEREOF, this Agreement has been executed on the date first above-written, to be effective upon satisfaction of the conditions set forth herein.

LENDER:

By: _____
Name: Richard Pachulski, solely in his capacity as the Plan Administrator for the bankruptcy estate of Randall Blanchard, whose case is pending in U.S. Bankruptcy Court for the Central District of California, Santa Ana Division, bearing case number 8:14-bk-14105-SC

BORROWER:

By: _____
Name: Randall Blanchard



# EXHIBIT 4

1  Jeremy V. Richards (CA Bar No. 102300)
   Teddy M. Kapur (CA Bar No. 242486)
2  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 13th Floor
3  Los Angeles, CA  90067
   Telephone: 310/277-6910
4  Facsimile: 310/201-0760
   E-mail:  jrichards@pszjlaw.com
5            tkapur@pszjlaw.com

6  Attorneys for Richard M. Pachulski,
   Chapter 11 Trustee

7

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA
                   SANTA ANA DIVISION

10 In re:                              Chapter 11

11 RANDALL WILLIAM BLANCHARD,          Case No. 8:14-bk-14105-SC

12                                     **FIFTH AMENDED PLAN OF
                    Debtor.            REORGANIZATION PROPOSED BY
13                                     CHAPTER 11 TRUSTEE FOR DEBTOR
                                       RANDALL WILLIAM BLANCHARD**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

L.P.); or (ii) extend to any undisclosed Assets of the Debtor, and the Plan Administrator reserves all of the Estate's rights and remedies to pursue such Assets.

### F.  **Discharge**

The Debtor shall not receive a discharge unless and until the Plan has been consummated such that the Plan Administrator has filed a notice and certification that all of the Debtor's payments and obligations under the Plan have been fully and completely performed (the "Plan Consummation Certification"). Thirty days prior to the Plan Administrator's filing of the Plan Consummation Certification, the Plan Administrator shall give notice to the Oversight Committee that the Plan Consummation Certification will be filed. Upon the Plan Administrator's filing of the Plan Consummation Certification, the Debtor shall be deemed to have received a discharge in the Chapter 11 Case pursuant to section 524 of the Bankruptcy Code.

Unless an objection to this Section IX.F of the Plan is made in writing by any Creditor affected by the Plan on or before the applicable objection deadline set by the Court, an order (which order may be the Confirmation Order) may be entered by the Bankruptcy Court granting the Debtor a discharge pursuant to Section 524 of the Bankruptcy Code.

Any discharge entered in the Case shall not discharge the Debtor from any debts that are nondischargeable under section 523 of the Bankruptcy Code or the obligations created by this Plan.

## X.

### OTHER PLAN PROVISIONS

### A.  **Conditions Precedent to the Effective Date**

The Plan will not be consummated or become binding unless and until the Effective Date occurs. A notice stating that the Effective Date has occurred shall be filed with the Court by the Plan Administrator within three (3) Business Days after the Effective Date.

The following are conditions precedent to the Effective Date of this Plan:

(i)  creditor MB-Bona LLC and the Debtor shall have entered into a stipulation in form and substance reasonably acceptable to both parties, approved by the Bankruptcy Court, which stipulation shall provide that: creditor MB-Bona LLC shall forbear from prosecuting or otherwise proceeding with its nondischargeability action against the Debtor pending before this Court as

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Adversary Proceeding Case No. 8:14-ap-01261 unless and until there is an Event of Default under

2    the Plan; and (b) so long as no Event of Default shall have occurred under the Plan, MB-Bona LLC

3    shall dismiss said adversary proceeding, and shall be deemed to have dismissed said adversary

4    proceeding, with prejudice, upon the filing of the Plan Consummation Certification;

5           (ii)     all of the funds in the Blanchard Enterprises Accounts and the Trust Accounts shall

6    have been transferred to the Trustee or the Plan Administrator, in accordance with section VII.A.1,

7    above;

8           (ii)     the Car Wash Modification Order shall have become a Final Order, and the Modified

9    Car Wash Notes shall be in full force and effect;

10          (iii)     the Bankruptcy Court shall have entered a Confirmation Order that is in form and

11   substance reasonably satisfactory to the Plan Proponent;

12          (iv)     the Confirmation Order shall have become a Final Order;

13          (v)     no stay of the Confirmation Order is in effect; and

14          (vi)     the Plan Administrator, after reasonable consultation with the Creditors' Committee,

15   shall reasonably determine that the Estate has sufficient Cash to fund the Plan Reserves.

16        Notwithstanding the foregoing, any or all of the foregoing conditions in whole or in part may

17   be waived by the Plan Proponent (such waiver shall not require any notice, Bankruptcy Court order,

18   or any further action).

19   **B.**    **Termination of Creditors' Committee**

20        On the Effective Date, the Creditors' Committee shall cease to exist and its members,

21   designated representatives and/or agents (including, without limitation, attorneys and other advisors

22   and agents) shall, subject to those matters set forth below, be released and discharged from any

23   further authority, duties, responsibilities and obligations relating to, arising from, or in connection

24   with the Creditors' Committee.  The Creditors' Committee shall continue to exist after such date

25   solely with respect to all the applications filed pursuant to sections 330 and 331 of the Bankruptcy

26   Code seeking payment of fees and expenses incurred by any Professional.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:293690.5 68704/001

**C.      Living Expense Loan and Seasmoke Advance**

Commencing on the first day of the calendar month immediately following the Effective Date, and thereafter on the first day of each calendar month until the earlier of: (a) the eleventh month following the Effective Date, or (b) September 1, 2016, the Estate shall pay to the Debtor, or his nominee, the sum of $25,000 for living and other expenses, of which $20,000 per month shall be treated as an advance to the Debtor (said advances collectively referred to herein as the "Living Expense Loan"). In addition, the Living Expense Loan shall include a one-time advance of $90,000 to Seasmoke Partners to cover a year of budgeted operating expenses to be made on the Effective Date (the "Seasmoke Advance"). The Living Expense Loan and Seasmoke Advance shall be repaid and recouped as set forth in Section VII.A.2, above. Until the Plan has been fully performed, the Debtor shall not be entitled to receive, nor shall he receive, any other compensation on account of services performed with respect to the Seasmoke Projects or Seasmoke Partners.

**D.      Executory Contracts and Unexpired Leases**

**1.      Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, any and all agreements executed by the Debtor before the Effective Date, other than agreements that were previously either assumed and assigned or rejected either by a Final Order or under Bankruptcy Code section 365, to the extent that these agreements constitute executory contracts or unexpired leases under Bankruptcy Code section 365, shall be rejected. For the avoidance of doubt, the lease agreement for the Mercedes CLS 550 is an executory contract and shall be rejected on the Effective Date.

The Confirmation Order shall constitute a Final Order approving the rejection provisions set forth in this Section X.D.1 of the Plan.

**2.      Bar Date for Rejection Damage Claims**

Any Rejection Damage Claims arising from rejection under the Plan of an executory contract or unexpired lease must be filed with the Bankruptcy Court and served on the Plan Administrator and his or her counsel within thirty (30) days after the Effective Date. Any Rejection Damage Claims that are not timely filed and served will be forever barred and unenforceable against the Debtor, the Estate, and the Plan Administrator, and their property, and the entities holding these

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA